IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| (1) Buckles Estate Properties, L.L.C.; | ) | |
| (2) Mike R. Richards, as Trustee of the | ) | |
| Mike R. Richards Oklahoma Trust; and | ) | |
| (3) Mary Ann Williamson, as Trustee of | ) | |
| the Mary Ann Williamson 1988 Trust, | ) | |
| on behalf of themselves and | ) | |
| all others similarly situated, | ) | No. CIV-21-40-PRW |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| (1) Mewbourne Oil Company; | ) | |
| (2) Mewbourne Holdings, Inc.; and | ) | |
| (3) Mewbourne Development | ) | |
| Corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of a Class of all other persons similarly situated, bring this claim for royalty underpayment against Defendants Mewbourne Oil Company, Mewbourne Holdings, Inc., and Mewbourne Development Corporation (collectively "Mewbourne"). In support of this claim, Plaintiffs state as follows:

## NATURE OF THE ACTION

1.     Plaintiffs and the Class bring claims against Mewbourne concerning its actual, knowing, and willful underpayment or non-payment of royalties on gas produced from Oklahoma wells through improper accounting methods (such as not paying royalty

1

based on the starting price for gas products but instead taking improper deductions), as more fully described below.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005 ("CAFA"), which gives federal district courts original subject matter jurisdiction over a class action involving "not less than 100 members," where "any member of a class of plaintiffs is a citizen of a State different from any defendant," and more than $5,000,000.00, exclusive of interest and costs, is in controversy, 28 U.S.C. § 1332(d)(2), (d)(2)(A) & (d)(5).

3.      As alleged herein, this class action involves more than 100 members. The matter in controversy exceeds $5,000,000.00, exclusive of interest and costs. And, as shown below, at least one member of the Class and Mewbourne are citizens of different states. Accordingly, this Court has original subject matter jurisdiction under 28 U.S.C. § 1332(d).

4.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because Mewbourne transacts business and operates wells in, *inter alia,* Ellis County, Oklahoma, which is within this Court's jurisdiction, and a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

5.      Plaintiff Buckles Estate Properties, L.L.C. ("Buckles Estate Properties") is a limited liability company organized under the laws of Oklahoma and has its principal place of business at 64 Myers Drive, Alva, Oklahoma 73717. Under Oklahoma law, a limited liability company is considered an "unincorporated association." Where, as here, a

party is an unincorporated association, 28 U.S.C. § 1332(d)(10) provides that the unincorporated association "shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." Accordingly, Buckles Estate Properties is a citizen of Oklahoma.

6.    Buckles Estate Properties has a royalty interest in one or more wells located in Ellis County, Oklahoma, for which Defendant Mewbourne Oil Company pays royalties on oil and gas production to Buckles Estate Properties.

7.    Plaintiff Mike R. Richards ("Richards") is an individual who resides in Fort Worth, Texas. He is the Trustee of the Mike R. Richards Oklahoma Trust ("the Richards Trust"), which is organized under the laws of Texas. For purposes of subject matter jurisdiction, it is deemed to be a citizen of Texas. 28 U.S.C. § 1332(d)(10).

8.    The Richards Trust has a royalty interest in one or more wells located in Ellis County, Oklahoma, for which Defendant Mewbourne Oil Company pays royalties on oil and gas production to The Richards Trust.

9.    Plaintiff Mary Ann Williamson ("Williamson") is an individual who resides in Weatherford, Texas. She is the Trustee of the Mary Ann Williamson 1988 Trust ("the Williamson Trust"), which is organized under the laws of Texas. For purposes of subject matter jurisdiction, the Williamson Trust is deemed to be a citizen of Texas. 28 U.S.C. § 1332(d)(10).

10.    The Williamson Trust has a royalty interest in one or more wells located in Ellis County, Oklahoma, for which Defendant Mewbourne Oil Company pays royalties on gas production to the Williamson Trust.

11.     Defendant Mewbourne Holdings, Inc. ("MHI") is the parent company of Defendants Mewbourne Development Corporation and Mewbourne Oil Company. MHI is a privately held corporation organized under the laws of the State of Texas with its principal place of business also in Texas. For purposes of subject matter jurisdiction, MHI is a citizen of Texas. 28 U.S.C. § 1332(c)(1).

12.     MHI is also registered to do business in the State of Oklahoma. Service of process may be obtained through its registered agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

13.     Defendant Mewbourne Development Corporation ("MDC") is a Delaware corporation with its principal place of business in Texas. For purposes of subject matter jurisdiction, Mewbourne Development Corporation is a citizen of Delaware and Texas. 28 U.S.C. § 1332(c)(1).

14.     MDC serves as the managing general partner of numerous limited liability partnerships, also organized under the law of Delaware, that sell limited and general partner interests pursuant to private placements to accredited investors. The limited partnerships participate in oil and gas activities through a Drilling Program Agreement to which the limited partnership, MDC, and Defendant Mewbourne Oil Company are parties. MDC has the exclusive right and full authority to manage, control, and administer the business of the limited partnerships. The limited partnerships have no employees of their own. Upon information and belief, included within MDC's exclusive right and full authority to manage, control, and administer the business of the limited partnerships is the

4

right and authority to determine the method for paying royalty under the oil and gas leases its partnerships hold.

15.     MDC is also registered to do business in the State of Oklahoma. Service of process may be obtained through its registered agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

16.     Defendant Mewbourne Oil Company ("MOC") is a corporation organized under the laws of the State of Delaware with its principal place of business in Texas. For purposes of subject matter jurisdiction, Mewbourne Development Corporation is a citizen of Delaware and Texas. 28 U.S.C. § 1332(c)(1).

17.     Like MDC, MOC is a wholly owned subsidiary of MHI. In addition, many of MOC's employees dedicate part of their time to the conduct of the business of the various Mewbourne Energy Partners limited partnerships.

18.     MOC is also registered to do business in the State of Oklahoma, where it currently operates wells at issue in this lawsuit. Service of process may be obtained through its registered agent, The Corporation Company, 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

19.     Upon information and belief, one or more undisclosed limited partnerships, of which MDC is the managing member, holds the leases of Plaintiffs Buckles Estate Properties, the Richards Trust, the Williamson Trust (collectively "Plaintiffs") and the putative class members; and, MOC operates the wells, enters contracts with third-party midstream service providers to market the gas production, and distributes proceeds from the sale of the gas products to working interest holders, royalty interest holders (including

Plaintiffs and the putative class members), taxing authorities, and other parties with an interest in production on behalf of MDC and the undisclosed limited partnerships. Indeed, MOC's website mentions nothing about the limited partnerships and directs questions about "Owner Relations" to it. See https://mewbourne.net/rio-faqs.htm.

20.    Defendants MOC and MDC are but mere instrumentalities or adjuncts of Defendant MHI, such that they are agents of one another, governed and controlled by the same board of directors, and engaged in a common business enterprise: to participate in oil and gas production and marketing for profit, such that each is liable for the acts of the others. Indeed, substantially all transactions of the enterprise are between MDC and MOC.

21.    Defendants have an interlocking board of directors, the majority of whom are members of one family.

| Name and Title | MHI | MDC | MOC |
|---|---|---|---|
| J. Roe Buckley, Chairman of the Board and Chief Financial Officer | X | X | X |
| Ruth M. Buckley, wife of J. Roe Buckley, Director and Assistant Secretary | | X | X |
| Dorothy M. Cuenod, sister-in-law of J. Roe Buckley, Director and Assistant Secretary | | X | X |
| Julie M. Greene, sister-in-law of J. Roe Buckley, Director and Assistant Secretary | | X | X |
| Kenneth S. Waits, Chief Executive Officer | X | X | X |
| Donald R. Russell, Treasurer and Controller | | X | X |

Source: Mewbourne Energy Partners 10-A, L.P., Annual Report (Form 10-K), at 12, Item

10 (Mar. 30, 2020).[1] According to this same Annual Report, Mewbourne's organizational structure does not provide for an audit committee or financial expert serving in such capacity. Thus, Mewbourne lacks this traditional legal formality to ensure the entities are treated separately and independently from one another.

22.    Defendants' headquarters is in Tyler, Texas. All Defendants have the same corporate address at 3620 Old Bullard Road, Tyler, Texas 75701. All Defendants had the same former address at 3901 S. Broadway, Tyler, Texas 75701.

23.    The acts charged in this Complaint as having been done by any Defendant were authorized, ordered, directed or done by its officers, agents, parent, affiliates, employees, or representatives while actively engaged in the conduct or management of Defendants' common business or affairs, and within the scope of their employment or agency.

---

[1] The limited partnerships formed after 2010 qualified as exempt offerings of securities so the overlap of directors and officers among Mewbourne entities is not publicly available for these limited partnerships: Mewbourne Energy Partners 11-A, L.P., Notice of Exempt Offering of Securities (Form D) (June 3, 2011); Mewbourne Energy Partners 12-A, L.P., Notice of Exempt Offering of Securities (Form D) (June 11, 2012); Mewbourne Energy Partners 13-A, L.P., Notice of Exempt Offering of Securities (Form D) (May 13, 2013); Mewbourne Energy Partners 14-A, L.P., Notice of Exempt Offering of Securities (Form D) (May 20, 2014).; Mewbourne Energy Partners 15-A, L.P., Notice of Exempt Offering of Securities (Form D) (May 29, 2015); Mewbourne Energy Partners 16-A, L.P., Notice of Exempt Offering of Securities (Form D) (July 6, 2016); Mewbourne Energy Partners 17-A, L.P., Notice of Exempt Offering of Securities (Form D) (June 1, 2017); Mewbourne Energy Partners 18-A, L.P., Notice of Exempt Offering of Securities (Form D) (June 15, 2018) Mewbourne Energy Partners 19-A, L.P., Notice of Exempt Offering of Securities (Form D) (June 11, 2019); Mewbourne Energy Partners 20-A, L.P, Notice of Exempt Offering of Securities (Form D) (Aug. 19, 2020). However, J. Roe Buckley signed the Form Ds on behalf of all these limited partnerships; and, all Forms D show Ruth Buckley, Dorothy Cuenod, Julie Greene, Kenneth Waits, among a few others, including Curtis W. Mewbourne (who is the father of Ruth Buckley, Dorothy Cuenod, and Julie M. Greene) as "Related Persons".

## THE LEASES

24.     Buckles Estate Properties, the Richards Trust, and the Williamson Trust each own a royalty interests in the Gertrude 16 AP well, located at Section 16, Township 18 North, Range 25 West in Ellis County, Oklahoma. Mewbourne is listed as the current operator of the well by the Oklahoma Corporation Commission, marketed the production from the well, and has paid royalties to the Plaintiffs during the relevant time period.

25.     Plaintiff Buckles Estate Properties is the lessor under the oil and gas lease for the Gertrude 16 AP well dated December 12, 2009 (recorded at Book 0794, Page 245 in the office of the County Clerk in Ellis County, Oklahoma). Plaintiff the Richards Trust is the successor-in-interest to Mike R. Richards, the original lessor, under the oil and gas lease for the Gertrude 16 AP well dated December 31, 2009 (recorded at Book 0801, Page 296 in the office of the County Clerk in Ellis County, Oklahoma). Plaintiff the Williamson Trust is the lessor under the oil and gas lease for the Gertrude 16 AP well dated December 31, 2009 (recorded at Book 0797, Page 350 in the office of the County Clerk in Ellis County, Oklahoma). Copies of Plaintiffs' oil and gas leases are attached hereto as **Exhibits 1-3**, respectively ("Plaintiffs' Leases").

26.     With respect to royalty on gas production, Plaintiffs' Leases are identical and specifically provide in relevant part as follows:

> 2.  In consideration of the premises the said Lessee covenants and agrees:
>
> > A.     [Omitted because it pertains to oil production which is not at issue in this case].
> >
> > B.     To pay Lessor for gas (including casinghead gas) and all other substances covered hereby, a royalty of 3/16ths of the **gross**

proceeds realized by Lessee from the sale thereof, less a proportionate part production, severance and other excise taxes ~~and the cost incurred by Lessee in processing, gathering, treating, compressing, dehydrating, transporting, and marketing, or otherwise making such gas or other substances ready for sale or use~~, said payments to be made monthly.

Exs. 1, 2 & 3, at pg. 1, ¶ 2, respectively (bold font and strikethrough in original). The Exhibit "A" to Plaintiffs' Leases contains these additional provisions with respect to royalty on gas production:

**(d) Royalty:** Lessee hereby agrees to deliver or cause to be delivered to Lessor, without cost into the pipelines, a royalty of three-sixteenths (3/16ths) part of the oil or gas produced from the lease premises and a three-sixteenths (3/16ths) part of all casinghead or drip gas or gasoline or other hydrocarbon substances produced from any well or wells on said premises.

**(e) No Deductions:** It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, <u>all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form</u>; however, Lessor's share of any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual costs of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee or any of its affiliates.

***

**(h) Best Price Available:** In selling any gas produced from the lease premises, or any lands with which the leased premises may be unitized, the Lessee shall exercise good faith and use due diligence and prudence to market such gas at the best price and upon the most favorable terms that may be obtainable by Lessee at the time or times such gas is contracted for sale, but in no event less than the price obtained by the operator of the well, or the operator's subsidiary, or any of its affiliates, through arms length negotiations with a bona fide purchaser.

      **(i) Other Consideration Received:** Notwithstanding anything to the contrary contained herein, Lessor shall be entitled to receive the stated royalty percentage of all monies received by Lessee which are in any way related to the interest herein leased, including, but certainly not limited to: take-or-pay settlements; contract negotiation bonuses; contract buy downs; and contract buy outs. This royalty shall be due within thirty (30) days after Lessee's receipt thereof.

Exs. 1, 2 & 3, at Ex. A, ¶ 16(d), (e), (h), and (i) (bold font in original; underlining added).

27.    In addition, Plaintiffs' Leases provide for the following twelve percent (12%) interest rate on royalty not paid when due:

      **(q) Interest:** Unless stated otherwise herein or if state statutes provide for a shorter period to make proper payments, excluding the first six-month period from date of first sales, all payments due to Lessor for royalties herein shall be delivered to Lessor within ninety (90) days after the last day of the month for which said royalties were due. <u>In the event that said payments are not received within that ninety (90) day time period, twelve percent (12%) compounded annual interest, calculated from the last day of the month for which said royalties were due, shall be paid to Lessor by Lessee.</u> At Lessor's option, all payments received shall be applied first to any outstanding interest due on prior late paid royalties, then to any prior outstanding unpaid royalties and then to any current royalties due. No notations on the remittance statements or provisions in any division order shall amend this provision.

Exs. 1, 2 & 3, at Ex. A, ¶ 16(q) (bold font in original; underlining added).

28.    Upon information and belief, sometime between 2010 and 2014, Mewbourne acquired interests in the properties subject to Plaintiffs' Leases from the original lessee, Chesapeake Exploration, L.L.C. ("Chesapeake Exploration"), or its assignee.

29.    In 2014, Mewbourne successfully applied to the Oklahoma Corporation Commission to drill and did in fact drill the Gertrude 16 AP well, in which Plaintiffs own

royalty interests. Thereafter, Mewbourne paid royalties on oil and gas production from that well directly to Plaintiffs.

30.    If Mewbourne operates the Gertrude 16 AP well as a working interest owner and pays royalty directly to Plaintiffs on behalf of an undisclosed Lessee, Mewbourne has apparent authority, if not actual authority, because:

a.  the undisclosed Lessee permits Mewbourne to act as Lessee by paying royalties directly to Plaintiffs with checks and check stubs that identify Mewbourne as the payor of the royalties and the entity obligated to pay royalties to Plaintiffs;

b.  Plaintiffs and the members of the proposed Class relied on the identification of Mewbourne as the entity obligated to pay royalties to Plaintiffs under their Leases; and

c.  Plaintiffs have sued Mewbourne believing it to be the Lessee under the Plaintiffs' Leases and, thereby, have changed their position based on Mewbourne's conduct to their detriment, if Mewbourne is not in fact the Lessee under Plaintiffs' Leases.

## <u>CLASS ACTION ALLEGATIONS</u>

31.    Plaintiffs bring this action individually and, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a Class defined as follows:

All last successors in interest to royalty owners in Oklahoma wells where Defendant Mewbourne Oil Co. ("Mewbourne") was the operator (or a working interest owner that marketed its share of gas and directly paid royalties to the royalty owners). The Class claims relate to royalty

payments for gas and its constituents (such as residue gas, natural gas liquids, helium, nitrogen, or drip condensate) from the first production month to the last production month in which Mewbourne operated or marketed gas or any of its constituents from the wells on behalf of itself or Defendants Mewbourne Development Corporation, Mewbourne Holdings, Inc., or any of their affiliated limited partnerships.

Excluded from the Class are: (1) agencies, departments or instrumentalities of the United States of America, including but not limited to the U.S. Department of the Interior (the United States, Indian tribes, and Indian allottees); (2) the State of Oklahoma or any of its agencies or departments that own royalty interests; (3) Mewbourne, its affiliates, predecessors, and employees, officers, and directors; (4) any publicly traded company (and its affiliated entities) that produces, gathers, processes, or markets gas; (5) the claims of royalty owners to the extent covered by arbitration clauses or prior settlement agreements, if any, still in effect at the time suit was filed herein; (6) overriding royalty owners and others whose interest was carved out from the lessee's interest; (7) royalty owners who have already filed and still have pending lawsuits for underpayment of royalties against any Defendant at the time suit is filed herein; (8) royalty owners only to the extent they take gas in-kind, if any; and, (9) royalty owners only to the extent receiving royalty payments for wells operated by Mewbourne Oil Company but marketed by others.

32.     The members of the Class number more than 100. The members are geographically dispersed throughout the United States and perhaps other countries such that joinder of all members as parties in a single action is impracticable.

33.     Mewbourne operates (or has operated) and/or markets (or has marketed) the gas production from hundreds of wells in which members of the Class own royalty interests. A map on Mewbourne's website shows the breadth of its operations:[2]

---

[2] Available at: https://mewbourne.net/locations.htm (last accessed Jan. 11, 2021).



34.   The Oklahoma Corporation Commission records Mewbourne as the operator of more than 500 currently active wells in Oklahoma.

35.   Mewbourne owns or owned a working interest in these wells, with at least one, and usually multiple, royalty owners for each well.

36.   Mewbourne has within its possession or control records that identify all persons to whom it has paid royalties from the wells in which members of the Class owned royalty interests during the Class Period.

37.   The questions of fact or law common to Plaintiffs and the Class include, without limitation, one or more of the following:

   a.   Whether Plaintiffs and members of the Class are beneficiaries of express lease terms or the implied Marketable Condition Rule (MCR) under Oklahoma law, either of which requires the operator

(MOC) to sever the gas from the ground and to prepare the gas for market at the operator's sole expense, i.e., without deduction for costs associated with producing and preparing the gas for sale.

b.    In what market for gas did MOC, as operator of the wells, choose to participate?

c.    Whether one or more of the midstream services costs of gathering, compression, dehydration, treatment, and processing (GCDTP) are costs associated with preparing the gas for that market.

d.    Whether Mewbourne deducted from royalties the costs of one or more of the midstream services performed to prepare the gas for the market in which Mewbourne chose to participate.

e.    Whether Mewbourne by deducting GCDTP costs from royalties failed to obtain the best price available for the products as the leases or the MCR require.

f.    Whether Mewbourne paid royalty to Plaintiffs and members of the Class for all valuable constituents coming from their wells and which inured to Mewbourne's benefit as consideration for GCDTP services either: 1) as credit toward the GCDTP midstream service costs; or 2) as in-kind contractual consideration to a midstream company (such as drip condensate, helium, liquefied nitrogen, some percentage of residue, some percentage of fractionated NGLs, plant fuel, or FL&U).

g.    Whether class-wide damages can be calculated for Plaintiffs' theories of liability.

38.    Plaintiffs are typical of other members of the Class because Mewbourne pays royalty to Plaintiffs and the members of the Class using a common method. Mewbourne pays royalty based on the net revenue it receives under its gas contracts, the terms of which royalty owners neither know nor approve of. The contracts are for services necessary to place the gas and its constituent parts into marketable condition so they can be sold into recognized, active, and competitive commercial markets.

39.     Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are royalty owners to whom Mewbourne directly paid or pays royalty. Plaintiffs understand their respective duties as Class Representatives. Plaintiffs have retained counsel competent and experienced in class action and royalty owner litigation.

40.     This action is properly maintainable as a class action. Common questions of law or fact exist as to all members of the Class, and those common questions predominate over any questions solely affecting individual members. *See supra*, ¶ 17. There is no need for individual Class members to present evidence or testimony to establish Mewbourne's liability to or damages sustained by Plaintiffs and the Class.

41.     Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action treatment will allow many similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts, and/or Mewbourne. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

42.     Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by all or some members of the Class. Joinder of all Class

15

members would be either highly impracticable or impossible. And the amounts at stake for individual Class members, while significant in the aggregate, would be insufficient to enable them to retain competent legal counsel to pursue claims individually. In the absence of a class action in this matter, Mewbourne will likely retain the benefit of its wrongdoing.

## GAS INDUSTRY BACKGROUND

43.     The members of the Class own royalty interests in wells that produce gas and constituents that are transformed into marketable products and sold into the established commercial markets for those products.

44.     Mewbourne's method for calculating royalty to the members of the Class is subject to uniform accounting procedures and implied marketable product law.

45.     Oklahoma law requires the lessee to bear all the costs of placing gas and its constituents into "Marketable Condition" products.

46.     Gas and its constituent parts are marketable products only when they are in the physical condition to be bought and sold in a commercial marketplace.

47.     Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that product.

### The Lessor-Lessee Relationship

48.     The lessor owns minerals, including oil and gas; the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter a lease that allows the lessee to take the minerals from the lessor's land. In

16

the past, the usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology, and increased efficiency of drilling rigs, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue.

49.    But the oil-and-gas companies have used undisclosed internal accounting practices to try to keep for themselves as much of the well revenue as possible. These accounting practices are at the heart of every oil-and-gas royalty case.

50.    Rather than adopting transparency in its royalty calculation formula, Mewbourne, like most lessees, has guarded its production and accounting processes as confidential or proprietary, thereby, depriving the royalty owners of information necessary to understand how Mewbourne calculates royalties. Consequently, the royalty owner is unaware of the lessee's actual practices, thereby enabling the lessee to breach the oil-and-gas lease without accountability.

51.    If and when one or more of the royalty owners learn of the "breach," the royalty owner has only three options—all of which are poor: (1) confront the lessee and maybe get paid while the lessee continues to retain improperly garnered gas revenues from hundreds or thousands of other unknowing royalty owners; (2) do nothing since the "breach" only results in a modest yearly loss and the expense of individual litigation would exceed the recovery, if any; or (3) file a class action lawsuit which will persist for years and probably will not recover the full loss. In short, if the lessee breaches, it may never be held accountable; and if a royalty owner complains, the lessee will still come out

ahead because an individual case is not worth much and a class action rarely requires 100% repayment to royalty owners plus prejudgment interest, plus attorneys' fees and expenses. The class action is the best of the three options, hence the filing of this class action lawsuit.

### Wellhead (Basic Separation and Gas Measurement)

52.     Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[3] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[4] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives, and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained, and takes fuel to operate. The water is drained off and sent for saltwater disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold (the payment

---

[3] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas."

[4] A minute portion of this raw gas may be used on a few leased lands to heat the farmhouse pursuant to a free gas clause in the lease. Although title to the gas sometimes is purportedly transferred, this is not a true sale. Some producers sell less than 3% of the raw gas to a local irrigator during the summer months for agricultural purposes, but this is not the economic market for which the wells are drilled.

of royalties on oil production is not at issue in this case).

53.    This Diagram #1 below illustrates the gas conditioning process:



*See* http://www.kgs.ku.edu/Publications/Oil/primer13.html (last visited Jan. 4, 2021). The

"gas line" on the upper left side of the diagram connects to the "Gathering Line Inlet" as

shown in Diagram # 2 below.

54.    Because production over time depletes the pressure of a well, on rare

occasion, on-lease compressors are installed to suction gas out of the well or to move the

gaseous mixture down the gathering lines. But when on-lease compressors are installed,

their use also requires fuel.

55.    The gaseous mixture produced from a single well cannot be processed

economically, so the mixtures from many wells are "gathered" together through gathering

lines and delivered to a processing plant for transformation into marketable products and

sale into commercial markets. This results in a gathering cost (G). The below diagram provides an overview of the midstream services. Mewbourne does not deduct from royalty any of the on-lease costs, i.e. costs incurred before the gathering line inlet (#1 on the diagram below). But Mewbourne does deduct the costs after the gathering line inlet and before the interstate pipeline inlet (#2 on the diagram below). The red portion of Diagram # 2 below shows the "Midstream Services" costs that are the subject of this case.



56.    As the gaseous mixture from each well enters the gathering line, it flows into a meter run where the mixture is measured for both volume (in Mcf) and quality (Btu content) (combined, "gas measurement," in MMBtu). The meter run must be constantly

maintained to record accurate measurements.

57.    Gathering pipelines are usually made of metal that could be corroded by water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor. This results in a dehydration cost (D).

58.    Gas will not move downstream from the well unless it is pressurized sufficiently to overcome the in-line back pressure and friction in the gathering line. So large gas compressors are installed to move the gas from the gathering line inlet to the processing plant. These compressors are expensive and require fuel to operate. This results in a compression cost (C).

59.    The gathering pipelines themselves cost money to lay and maintain, though most have been in place for decades. Gas condensate (gas condensed into liquid as it cools and is pressurized) ("Drip Condensate") is collected at points along the gathering lines as a result of cleaning or "pigging the line" and is captured for fractionation and sale later. Lessees usually pay no royalty on the revenue generated from the sale of the drip condensate even though the drip condensate is produced from the wells.

60.    Finally, gathering lines leak, especially as they age, resulting in fuel lost and unaccounted for gas ("FL&U"). Lessees pay no royalty on the volume of FL&U.

**Natural Gas Processing**

61.    Once the gas mixture from multiple wells (and often from multiple gathering systems) is gathered, the mixture enters the inlet of the processing plant where the mixture will be transformed into methane and mixed NGLs.

62.    The plant removes impurities that remain in the mixture, such as carbon

dioxide, nitrogen, or sulfur, before the mixture can be processed. This incurs a "treatment cost" (T).

63.     The final cost, processing (P), involves services to transform the gas mixture into methane gas (also called "residue gas"), natural gas liquids ("NGLs"), and in the Panhandle of Oklahoma, crude helium.

    a.  Methane must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission ("FERC") which is called "pipeline quality gas".

    b.  The NGLs are used as a feedstock in the petrochemical and oil refining industries. To separate the NGLs from the gaseous mixture, they are cooled to temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The NGLs move into a liquids pipeline and are processed by a fractionator into their marketable products: ethane; propane; butanes; and pentanes plus. In the gas contracts, this process incurs a "T&F" or "fractionation" fee, even though lessees sometimes give away the NGLs in keep-whole agreements as in-kind consideration for the other services the midstream company provides.

    c.  Helium is processed into Grade A helium at new processing plants or into crude helium (contaminated with nitrogen) at older plants which is then processed into Grade A helium at a nearby helium processor (often a few hundred feet away).

64.     This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel"). Mewbourne does not pay royalty on plant fuel, even though the plant fuel is gas that comes from Class Wells.

65.     At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas) and (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). In helium rich production areas, Grade A or crude helium, along with liquefied nitrogen also emerges. But none of these products are commercially marketable at this point.

## Marketable Condition for the Products

66.     *Methane Gas*. Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor.

67.     *NGLs*. The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products – ethane, propane, butane, isobutene, natural gasoline, etc. In computing royalty for NGLs, Mewbourne improperly deducts T&F and/or other processing costs needed to reach commercially marketable fractionated NGLs.

68.     *Other Products*. In some areas of the country (e.g., in the Hugoton Field, which stretches across Southwest Kansas, the Oklahoma Panhandle, the Texas Panhandle, and into parts of Wyoming), helium is produced in commercial quantities and recovered, along with liquefied nitrogen. Other areas of the country produce sulfur and

23

carbon dioxide in commercial quantities. When such products are available in commercial quantities, processing and treatment plants recover these valuable constituents, but lessees pay little or nothing to the royalty owners for their value. Royalty owners should be paid for the gas and all constituents produced and sold or used.

### Sale of Products

69.     To turn the marketable products into money, the operator enters contracts for the midstream company to sell the products in the commercial marketplace in an arm's length transaction. No money exchanges hands until the residue gas is sold at the Index pool, the fractionated NGLs at the price set by the Oil Price Information Service ("OPIS"), and any other marketable products at the prices established by their respective commercial markets. Lessees attempt to obscure this fact with self-serving language in gas marketing contracts about title transfer or even by creating a wholly owned affiliate to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

70.     The "starting price" for gas products is always achieved, as it must be, at a commercial market price. All the gas contracts express the commercial market price in one of two ways: (a) a market price, called an "Index" price for residue gas and "OPIS" price for fractionated NGLs, or (b) a "weighted average sales price" or "WASP" achieved at the same residue Index market or OPIS market. This difference stems from Mewbourne's market power to, over time, obtain above "Index" or "OPIS" price in its arm's length sale. Whichever starting price is used in an arm's length transaction, that price is the highest and best reasonable price for the valuable gas products. If other products are also produced, they are and must be also priced in a commercial market.

71.    Affiliate gas contracts are not arm's-length sales in a commercial market. Instead, the later arm's-length sale by the affiliate in the commercial market is the true sale that should be used as the "starting price" for marketable condition gas products.

   a.  Some lessees contract with affiliated gathering companies or other affiliated gas service providers before the products (residue gas and/or NGLs) are in Marketable Condition in an effort to: (1) artificially, and improperly, create a commercial market where none truly exists so they may justify deducting costs from royalty, or not paying for all of the gas or constituent products produced; (2) charge "marketing fees" to royalty owners even though the lessee is already obligated under the lease to prepare the gas for market and market the gas and constituent products; and/or (3) pay on the lower lessee/affiliate sale price and not the higher affiliate/third party price.

   b.  WASP involves a pool of sales transactions to third parties (and/or affiliates) and combines the prices paid by those third parties (and/or affiliates) to arrive at a "weighted average sales price." Lessees can manipulate this process by using lower lessee/affiliate sales prices for part of the pool price, rather than all third-party arm's length sale prices.

72.    Fictitious "sales" (also known as sham sales or conditional sales) are created by lessees to pass off a non-commercial market sale as if it should be the starting point for royalty payments. But none of these efforts comport with economic reality or are in good faith with respect to royalty owners. For instance:

a.  Anything of value can be sold at any place and in any condition.

b.  Gas and other minerals can and are routinely sold in the ground, but they are not in marketable condition.

c.  Gas could be sold at the bottom of the hole when it is severed from the surrounding rock and enters the downhole pipe. Although a contract driller might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his drilling services, that agreement does not make the transaction a real market sale.

d.  Gas could be sold "at the wellhead" when the gas is severed from the surface. Although a contract operator might be willing to accept some percentage of the future sale of oil or gas in the real marketplace as compensation for his well operating services, that transaction does not make it a real market sale.

e.  Gas also could be sold at the gathering line inlet when the gas enters the gathering line and changes custody. Although a contract gatherer might be willing to accept some percentage of the future sale of gas in the real marketplace as compensation for his gathering services, that transaction does not make it a real market sale.

f.  Gas also could be sold at the processing plant inlet when the gas changes custody to the processing plant. Although a contract processor might be willing to accept some percentage of the future sale of gas in

the real marketplace as compensation for his processing services, that transaction does not make it a real market sale.

g.  The lessee could simply pay for all these services with monetary fees or in-kind contributions of all or part of the valuable constituents. But the structure of the transaction does not change the fact that the services are necessary to prepare the gas and valuable constituents for the first real sale into the commercial market – Index or OPIS.

h.  Nor does a contract saying title transfers at a custody transfer point create a sale of marketable products in a real commercial market. Some gas contracts with midstream companies that provide GCDTP services purport to do that, but other parts of the gas contract demonstrate that it is a poorly attempted legal sleight of hand as (i) the risk of loss that usually passes with a true title transfer and market sale does not happen; (ii) the cost of future downstream services that usually passes with a true title transfer and market sale does not happen; (iii) the starting price that would occur with a true title transfer and market sale does not happen. Indeed, the paper title transfer is unnecessary to receiving the midstream services as the gas could (and sometimes does) receive the exact same midstream services without the paper title transfer.

i.  All the gas contracts implicitly recognize this paper title transfer fiction, as the starting price for gas products always is at the Index and OPIS market pool as previously described.

j.  Midstream services providers are not buyers and resellers of raw gas. They are service providers that convert raw gas into pipeline quality gas so it can enter the Index or OPIS market pools. Indeed, they are called Midstream servicers, not Midstream purchasers.

**Different Ways Mewbourne Underpays Royalty Owners**

73.    The extraordinarily large dollars at stake and the one-sided nature of the gas lessor-lessee relationship are constant temptations to lessees to wrongfully retain gas revenues. All payment formulas, all affiliate and non-affiliate contractual relationships, and all calculations are firmly kept in the exclusive control of lessees, and they involve undisclosed accounting and operational practices. As a result, there are many ways that royalty owners are underpaid on their royalty interests, and they never know it. The common thread through all these schemes is that they are typically buried in the internal lessee accounting systems or royalty-payment formulas.

74.    Mewbourne represents the royalty calculation on the form of a monthly check stub it sends to each royalty owner. A snip from one of the check stubs to Buckles Estate Properties appears below.

MEWBOURNE OIL COMPANY
REVENUE DISBURSEMENT ACCOUNT
P O BOX 7698
TYLER, TX 75711-7698

Owner Relations:   (903) 561-2900

Written Inquiries:   MEWBOURNE OIL COMPANY
P O BOX 7698
TYLER TX 75711-7998 US

### Legend

| Product Codes (PC) | Interest Type | Tax Type Codes | | Deduct Codes (Ded Cd) | |
|---|---|---|---|---|---|
| 100 - Oil (bbl) | WI - Working Interest | AV - Ad Valorem Tax | GP - Gas Processor Tax | 01 - Compression | 09 - Excess Royalty | 36 - State |
| 200 - Gas (mcf) | RI - Royalty Interest | CN - Conservation Tax | PE - Petroleum Excise Tax | 02 - Dehydration | 1C - Other | Withholding |
| 300 - Condensate (bbl) | OR - Overriding Royalty | EV - Environmental Tax | RG - Oilfield Site Restoration | 03 - Processing | 11 - Gathering | Tax |
| 400 - Plant Products (gal) | BL - Blanched Interest | PV - Privilege Tax | FB - Federal Backup Withholding | 04 - Treating | 12 - Marketing | |
| DRP - Drip Condensate (bbl) | PR - Production Payment | EX - Oil Extraction | MP - Marginal Production Tax | 05 - Transportation | 19 - Jib Offset | |
| | | FE - Environmental Tax | PR - Gross Production Tax | 06 - Brine | LU - Lease Use Cost | |
| Disposition Codes (DC) | | UI - Unidentified Tax | WH - State Withholding Tax | 07 - Fuel | KR - KS Resources Fund | |
| 15 - Sales | 19 - Lease Use | 26 - Stim Oil | SV - Severance Tax | ES - Emergency School Tax | 08 - Mkt Cost Reimb | IR - IRS Levy | |
| | | RG - Pipeline Tax | NF - Energy Recovery Revolving Fund | | | |

Owner   BUCKLES ESTATE PROPERTIES LLC   CHECK 1055505 / 01/15/2020   Page 2 of 2

| Property Number | Property Name, Tract Description | DC | PC | Entitlement Decimal | DOI Type | Avg Price | Prop Gross Volume | Prop Sev. Value $ | Prop Sev. Tax $ | Tax Type Code | Prop Deducts $ | Ded Cd | Prop Net Value $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales Date M/D/Year | County Name | ST | Tier | Disbursement Decimal | Int Type | | Owner Volume | Owner Gross Value $ | Owner Sev Tax $ | Other Withholding | Owner Deducts $ | | Owner Net Value $ |
| 53631000 | GERTRUDE 16 AP 1HT | 03 | 100 | 0.01171878 | REV | 55.4600 | 171.14 | 9,491.16 | 619.42 | PR | | | 8,871.74 |
| 11/01/2019 | Ellis | OK | 1 | 0.01171933 | RI | | 2.02 | 111.23 | 8.02 | | | | 103.23 |
| 53631000 | GERTRUDE 16 AP 1HT | 03 | 200 | 0.01171875 | REV | 2.3800 | 691.24 | 1,643.17 | 1.41 | EX | | | 1,536.94 |
| 11/01/2019 | Ellis | OK | 1 | 0.01172125 | RI | | 8.07 | 19.26 | 0.01 | | | | 17.90 |
| 53631000 | GERTRUDE 16 AP 1HT | 03 | 200 | 0.01171875 | REV | | | | 0.09 | MP | | | |
| 11/01/2019 | Ellis | OK | 1 | 0.01172125 | RI | | | | | | | | |
| 53631000 | GERTRUDE 16 AP 1HT | 03 | 200 | 0.01171875 | REV | | | | 104.26 | PR | | | |
| 11/01/2019 | Ellis | OK | 1 | 0.01172125 | RI | | | | 1.34 | | | | |
| 53631000 | GERTRUDE 16 AP 1HT | 03 | 200 | 0.01171875 | REV | | | | 1.49 | RF | | | |
| 11/01/2019 | Ellis | OK | 1 | 0.01172125 | RI | | | | 0.05 | | | | |

The form of check stub shows: (a) the property number; (b) property name and tract description; (c) "DC", which corresponds to the "Disposition Code" shown in the "Legend", and "ST" for State (which in this case will all be "OK" for Oklahoma); (d) "PC," which stands for "Product Code" as shown in the "Legend" and "Tier," which is not explained; (e) the "Entitlement Decimal" and the "Disbursement Decimal," which show the royalty owner's decimal interest in the proceeds; (f) the "DOI Type," which is not explained (but "Rev" probably stands for "Revenue" and indicates the "DOI" or "Division of Interest" pertains to the Revenue from the sales of the products), and "Int Type", which corresponds to the "Legend", which in this case is "RI" for "Royalty Interest"; (g) the "Avg Price," which is a price derived from the gas contracts under which the products were sold and not the actual price at which the products were sold; (h) the "Prop Gross Volume" and "Owner Volume", which ostensibly shows the "gross"

volume produced from the property multiplied by the owner's disbursement decimal to derive the volume attributed to the Owner's royalty interest; (i) "Prop Gross Value $" and "Owner Gross Value $," which ostensibly shows the "Avg Price" multiplied by the "Prop Gross Volume" or "Owner Volume"; (j) "Prop Sev. Tax $" and "Owner Sev. Tax $," which ostensibly shows deductions from the Gross Value columns for severance taxes; (k) "Tax Type Code" and "Other Withholding," which ostensibly shows the codes corresponding to the "Legend" for the tax deductions from the Gross Value columns; (l) "Prop Deducts $" and "Owner Deducts $" which contain no information; (m) "Ded Cd", which corresponds to the "Legend" but, again, shows no information; and (n) "Prop Net Value $" and "Owner Net Value $," which ostensibly shows the "Prop Gross Value $" less the "Prop Sev. Tax $" and the "Owner Gross Value $" less the "Owner Sev. Tax $". The check stubs to the Richards Trust and the Williams Trust have the same format as shown above. Plaintiffs dispute the truth of the volumes, prices, deductions, and values shown.

75.    Mewbourne underpays royalty to Plaintiffs and other Class Members in one or more of the following ways:

> a.  *Residue Gas*. The starting price paid for residue gas should be an arm's length, third party market sales price for residue gas at pipeline quality. All Mewbourne's gas contracts will show this to be true. But, instead of paying on that gross competitive price, Mewbourne pays on a net price after directly taking or allowing midstream companies to indirectly take

Midstream Services GCDTP deductions (both monetary fees and in-kind volumetric deductions), which are not shown on the check stubs.

b. *NGLs*. The starting price paid for fractionated NGLs should be an arm's length, third party market sales price for ethane, propane, normal butane, iso-butane, and pentane plus (a/k/a natural gasoline). All Mewbourne's gas contracts will show this to be true. But instead of paying on that gross competitive price, Mewbourne pays royalty (i) for only some of the NGLs produced (some is lost and unaccounted for in the gathering process, lost in plant fuel or compression fuel); (ii) after deducting processing fees and expenses (often keeping in-kind a Percentage of the Proceeds ("POP") of the fractionated NGLs as payment for the processing services); and, (iii) after reducing payment by T&F.

c. *Drip Condensate*. Plaintiffs and the Class Members' wells produce heavy hydrocarbons that condense in the pipeline. Mewbourne, or a third-party on behalf of Mewbourne (gatherers and/or processors), recovers those hydrocarbons for sale. Mewbourne fails to pay any royalty for that Drip Condensate.

d. *Other Products*. Helium is contained in the well-stream produced from many the Class Members' wells, but Mewbourne: (i) fails to pay royalty for all of the helium produced (some is lost and unaccounted for in the gathering and processing process); (ii) deducts processing fees and costs

even though the helium is not yet in commercial grade; and (iii) pays at a lower than commercial Grade A price. Often, Mewbourne does not pay any royalty at all for Helium, for liquid nitrogen, or other products taken from the Class Members' wells.

## ACTUAL, KNOWING AND WILLFUL
## UNDERPAYMENT OR NON-PAYMENT OF ROYALTIES

76.    The underpayment and non-payment of royalties are done with Mewbourne's actual and willful knowledge and intent.

77.    Mewbourne is well familiar with the fact that many other producers in Oklahoma have resolved the same claims for hundreds of millions, if not billions, of dollars or have changed their royalty payment practices to cease the improper deductions described here.

78.    Nevertheless, Mewbourne continues its improper payment practices with actual and willful knowledge and intent.

## CAUSES OF ACTION

## COUNT I
## BREACH OF LEASE

79.    The allegations set forth above are incorporated herein by reference.

80.    **The contracts are the oil and gas leases.** Plaintiffs and members of the Class entered into written, fully executed oil-and-gas leases with Mewbourne, and those leases include express and implied covenants requiring Mewbourne to prepare the gas and its constituent parts for market at Mewbourne's sole cost. The leases containing the All Constituents Clause obligated Mewbourne to pay royalty on all constituents (*i.e.*, gas

32

and "all substances contained in such gas") and produced from the leases premises.

81.    **Mewbourne breached the leases.** Mewbourne breached the terms of the leases, including implied covenants, by its actions and/or inactions in underpaying royalty or not paying royalty on all products sold from the gas stream as set forth above.

82.    **Plaintiffs sustained damages.** As a result of Mewbourne's breaches, Plaintiffs and the members of the Class have been damaged through underpayment of the actual amounts due.

83.    Further, Plaintiffs and the members of the Class are entitled to other damages provided by Oklahoma statute, including compound pre-judgment and post-judgment interest and punitive damages, as more fully set forth below. *See* OKLA. STAT. tit. 52, § 570.1, *et seq.*; OKLA. STAT. tit. 52, § 903; OKLA. STAT. tit. 23, § 9.1.

<u>COUNT II</u>
**FRAUD, DECEIT, AND CONSTRUCTIVE FRAUD**

84.    The allegations set forth above are incorporated herein by reference.

85.    Mewbourne made uniform misrepresentations and/or omissions on the monthly check stubs sent to Plaintiffs and members of the Class. Mewbourne made one or more material representations that were false and/or omitted to state one or more material facts needed to make what was stated not misleading,

86.    Mewbourne knew when material misrepresentations were made on the check stubs that: a) the statements were false or misleading; b) the statements were made recklessly without knowledge of their truth; or c) the statements were made with the intent that Plaintiffs and members of the Class would rely on them.

33

87.    The check stubs reflected lower volume of gas than what was actually produced or sold, lower prices than those actually paid for the gas products sold in the market, fewer constituents than what were actually produced or sold, and fewer monetary fees and in-kind volumetric deductions than were actually taken from the proceeds on the gas produced or sold.

88.    Plaintiffs and members of the Class relied on the check stubs to accurately reflect and account for the actual volume of gas and all constituents produced, the actual disposition of all volumes of gas and all constituents, that actual gross market process at which the gas products were sold, and the actual calculation of royalties that Mewbourne was to make under the leases. The check stubs appeared accurate based on the limited information Mewbourne provided to the members of the Class, but were not as shown by the gas contracts, monthly plant statements, and monthly pay decks which Mewbourne had, but kept secret from the members of the Class.

89.    Plaintiffs reasonably and justifiably relied on the accuracy of the data shown on the monthly royalty payments from Mewbourne and, based on the same information provided and withheld from Class Members, a reasonable inference of reliance can be drawn. They also lacked the knowledge, experience, and access to information detailed above to even begin to question or suspect the accuracy of the data shown on the monthly royalty payment and Mewbourne's method for calculating royalty, and if they were to ever raise questions, could not meaningfully refute the excuses provided by Mewbourne.

34

90.     Plaintiffs and the members of the Class relied on and/or are legally presumed to have relied upon these uniform written representations as being truthful and accurate, when they were neither true nor accurate. Plaintiffs and members of the Class were underpaid royalty and suffered injury as a result.

91.     Mewbourne also concealed or failed to disclose facts about the price, volume, value, various products produced, and deductions, which Mewbourne had a duty to disclose to avoid presenting half-truths or misrepresentations.

92.     Mewbourne undertook the duty to properly account by making the statements in check stubs on a monthly basis to royalty owners.

93.     By speaking on the issue, Mewbourne had a duty to make full and fair disclosure of all relevant facts. This is especially so because Mewbourne had superior and/or specialized knowledge and/or access to information when compared to royalty owners.

94.     Mewbourne knew that its representations or omissions on the monthly check stubs were at least ambiguous and created a false impression of the facts to the royalty owners.

95.     Mewbourne knew the facts were particularly within its knowledge and that Plaintiffs and members of the Class were not positioned to discover the facts pertaining to the proper volumes, values, and constituents coming from their wells. Accordingly, having spoken on the subject matter, Mewbourne had a duty to make full and fair disclosure of all material facts such that its statements were not misleading, but did not.

96.     Mewbourne was deceitful by suggesting, as a fact, that the volumes, prices, values, and other statements were as set forth on the monthly check stubs when those statements were not true. Mewbourne knew the statements were not true, had no reasonable grounds for believing they were true, or gave only such information as was likely to mislead for want of the communication of the non-disclosed facts.

97.     The misrepresentations and omissions were intentionally made. They were intended to suggest that the price was a third-party commercial price without hidden deductions, the volumes were accurately measured without volumetric deductions, that royalty was paid on all constituents produced from the well, and that deductions would be shown on the check stub when in fact they were not.

98.     By creating and mailing misleading check stubs to Plaintiffs and members of the Class, Mewbourne fraudulently and deceitfully misled Plaintiffs and members of the Class into believing that Mewbourne had paid them royalty on the full value of the production from their wells. Mewbourne failed to pay the proper amounts of royalty with actual, knowing and willful intent: (a) to deceive royalty owners to whom the proceeds were due; or (b) to deprive proceeds from the royalty owners that Mewbourne knew or was aware of were legally entitled to them. OKLA. STAT. tit. 52, § 903; OKLA. STAT. tit. 23, § 9.1.

99.     Mewbourne acted intentionally, willfully, or recklessly in disregard of the rights and implied covenants of Plaintiffs and members of the Class, on a uniform basis, by not properly paying royalty to royalty owners, by deceiving them with check stubs that were misleading, and by failing to correct its royalty payment practices such that

punitive damages should be awarded and a finding should be made that Mewbourne acted intentionally and with malice toward Plaintiffs and the members of the Class.

100.    As a direct and proximate result of Mewbourne's deceit and fraud, Plaintiffs and members of the Class were underpaid monthly for royalties and are entitled to recover actual and punitive damages.

101.    In addition, the money wrongfully obtained by Mewbourne as a result of what should have been paid to Plaintiffs and members of the Class should be held in constructive trust along with monetary interest for Plaintiffs and the Class.

102.    Because Plaintiffs and the Class were deceived and did not have requisite information to reveal Mewbourne's scheme, they are entitled to tolling of any applicable statute of limitation periods. Because of Mewbourne's misrepresentations, omissions, and/or general scheme to conceal its underpayments, Plaintiffs and the members of the Class did not become aware and could not have become aware through the exercise of reasonable diligence, that such schemes were in existence. Therefore, Plaintiffs and members of the Class are entitled to toll the applicable statutes of limitations, based upon the doctrines of fraudulent concealment, discovery rule, continuing conduct, and/or equitable estoppel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class seek:

1.    An order certifying and allowing this case to proceed as a class action with Plaintiffs as Class representatives for the Class and the undersigned counsel as class counsel;

2.    An order requiring Defendant to pay Plaintiffs and all of the Class Members' actual damages to fully compensate them for losses sustained as a direct, proximate, and/or producing cause of Defendant's breaches and/or unlawful conduct;

3.    An order awarding punitive damages as determined by the jury and in accordance with Oklahoma law on each of Defendant's wrongful acts, as alleged in this Class Action Complaint;

4.    An order requiring Defendant to pay the attorneys' fees and litigation costs of the Plaintiffs and Class from the common recovery fund; and

5.    Such costs and other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all matters so triable.

## ATTORNEYS' LIEN CLAIMED.

/s/  Rex A. Sharp
Rex A. Sharp OBA#11990
Sharp Law, LLP
5301 W. 75th Street
Prairie Village, KS 66208
(913)901-0505
(913) 901-0419 fax
rsharp@midwest-law.com

Barbara C. Frankland OBA #33102
Sharp Law, LLP
11990 Grant Street, Suite 550
Northglenn, CO 80233
(720) 932-0700 (telephone and fax)
bfrankland@midwest-law.com

and

/s/  Cody J. McPherson
Cody J. McPherson OBA#20282
Arthur W. Schmidt OBA# 7960
Mahaffey & Gore, P.C.
300 N.E. 1st Street
Oklahoma City, OK 73104-4004
(405) 236-0478 x.229
(405) 236-1840 fax
cmcpherson@mahaffeygore.com

*Plaintiffs' Counsel*